1  Joshua B. Swigart (SBN 225557)
2  Josh@SwigartLawGroup.com
   **Swigart Law Group, APC**
3  2221 Camino del Rio S, Ste 308
   San Diego, CA 92108
4  P: 866-219-3343
5  F: 866-219-8344

6  *Attorneys for Plaintiffs and The Putative Class*

7

8

9          **UNITED STATES DISTRICT COURT**
10        **SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| TYLER MAGHONEY, individually and on behalf of others similarly situated, | Case No: 3:24-cv-02394-AJB-AHG |
| Plaintiffs, | CLASS ACTION<br>**FIRST AMENDED**<br>**COMPLAINT FOR DAMAGES:** |
| vs. | |
| | 1. **Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)** |
| DOTDASH MEREDITH INC., | 2. **Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631** |
| Defendant. | 3. **Violation of the California Confidentiality of Medical Information Act Cal. Civ. Code § 56.10** |
| | 4. **Invasion of Privacy Under California's Constitution** |
| | 5. **Violation of the California Computer Data Access and Fraud Act** |
| | 6. **Cal. Penal Code. § 502 Use of a Pen Register or Trap and Trace Device Cal. Penal Code § 638.51** |
| | 7. **Violation of the Computer** |

First Amended Complaint - Class Action

| | |
|---|---|
| | Fraud and Abuse Act 18 U.S.C. § 1030 |
| | 8. **Violation of the Stored Communications Act 18 U.S.C. § 2701** |
| | 9. **Violation of the Federal Wiretap Act 18 U.S.C. § 2511** |
| | **Jury Trial Demanded** |

First Amended Complaint - Class Action

## INTRODUCTION

Plaintiff Tyler Maghoney ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant Dotdash Meredith Inc.[1] ("Dotdash" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.   This is a class action lawsuit brought on behalf of all California residents who accessed https://www.VerywellHealth.com/ (the "Website"), to research personal health and wellness issues and or obtain medical treatment and/or services.    https://www.verywellhealth.com/ (last accessed December 13, 2024).

2.   Defendant's website boasts 320 million visitors each year, 140+ medical reviewers and more than 500 medical topics covered on their website. Id.

3.   When engaging with Defendant's online resources, safeguarding personal health information is paramount. Users anticipate that their data will remain confidential and not be disclosed to third parties without explicit consent. This expectation is particularly significant when accessing sensitive health topics, such as mental health or sexual health. Interactions on these subjects may involve deeply personal details, including medical histories and personal experiences, as well as searches involving sensitive medical subjects. The emotionally sensitive and potentially stigmatizing nature of this information underscores the critical importance of robust data protection measures to maintain user trust and ensure privacy.

4.   Moreover, information concerning an individual's healthcare, including

---

[1] Plaintiff initially misnamed the correct entity: Dotdash Media Inc. (the named Defendant) which was renamed Dotdash Meredith Inc. in March of 2024.

First Amended Complaint - Class Action

medical procedures, is protected by state and federal law. Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant aided, employed, agreed, and conspired with various third parties, as more definitely alleged below, to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications containing protected medical information. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

5.   Plaintiff Tyler Maghoney is a natural person and an adult citizen of the state of California, domiciled in San Diego, California.

6.   Defendant Dotdash Meredith Inc. ("Defendant") is a foreign corporation formed under Delaware laws with a principal place of business in 225 Liberty Street, 4th Floor New York, NY 10281 which operates, amongst other things, a Website known as www.verywellhealth.com that is the subject of this litigation.

## JURISDICTION AND VENUE

7.   This Court has personal jurisdiction over the Defendant because it has sufficient minimum contacts with this District in that it operates and markets their services throughout the country and in this District.

8.   Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises out of Defendants' violations of the Wiretap Act, 18 U.S.C. §2510 et seq.

9.   Jurisdiction is also established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a resident of the State of California, seeks relief on behalf of (1) a national class and (2) a California subclass, which will result in at least one Class Member belonging to a different state than Defendant, a Delaware Corporation with its principal

4

First Amended Complaint - Class Action

place of business in New York, NY.

10. Plaintiff is requesting statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510 et seq and $2,500 per violation of Cal. Penal Code §631, which when aggregated among a proposed class number in the hundreds of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

11. Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

12. Because Defendant conducts business within the State of California, having licensed itself to do business in this State with the California Secretary of State and is in good standing.

13. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

14. Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business as a website in the State of California within this judicial district at all times relevant; and, (iii) Defendant has registered the following agent of process with the California Secretary of State:

**Agent1505 Corporation**
C T CORPORATION SYSTEM
CA Registered Corporate (1505) Agent Authorized Employee(s)
AMANDA GARCIA
330 N BRAND BLVD, GLENDALE, CA

https://bizfileonline.sos.ca.gov/search/business last accessed December 14, 2024.

15. Unbeknownst to Plaintiff, Defendant assisted Google and others with intercepting Plaintiff's communications within the State of California, including those that contained personally identifiable information ("PII"),

protected health information ("PHI"), and related confidential information. Defendant assisted in these interceptions without Plaintiff's knowledge, consent, or express written authorization. Defendant breached its duties of confidentiality by unlawfully disclosing Plaintiff's PII and PHI.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

17. This Court has personal jurisdiction over the parties because the parties reside in California. Further, Defendant has at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California.

18. Defendant purposefully availed itself of the privilege of conducting business in California by deploying data-tracking technologies specifically designed to monetize the online activities of California residents.

19. Through its operation of VerywellHealth.com, Defendant collected and transmitted user search queries, page visits, and browsing behavior in real-time to third-party data analytics and advertising companies, many of which are headquartered in California.

20. Defendant profited from the sale and exchange of this data, enabling highly

First Amended Complaint - Class Action

targeted advertising that disproportionately affected California users.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and its principal place of business is in this District.

22. Defendant is a Delaware corporation headquartered in New York, NY and does business throughout the United States, deriving substantial revenue from interstate commerce in California and has purposeful continuous contact with the residents of California.

## Concrete Injury

23. Plaintiff has suffered a concrete and particularized injury-in-fact as a direct and proximate result of Defendant's unlawful conduct.

24. Defendant systematically intercepted, recorded, and disclosed Plaintiff's private communications, including search queries related to highly sensitive health information, without consent.

25. Specifically, Plaintiff's personally identifiable search terms activity regarding his personal sexual health was unlawfully transmitted to Google Analytics, DoubleClick, and other third-party advertisers, which then profiled Plaintiff's health-related interests for targeted advertising and monetization.

26. Plaintiff's searches and pages that he viewed were related to Sexually Transmitted Infections ("STI").

27. Plaintiff's searches mostly related to symptoms, contraction, and treatment for chlamydia but also included searches for genital warts.

28. During his visits to the Defendant's website VerywellHealth.com, on or about December 6, 2024, and December 13, 2024, Plaintiff typed specific search terms into the search bar on the website for:

- chlamydia
- chlamydia oral
- cure chlamydia

7

- chlamydia treatment
- sex after chlamydia
- chlamydia contagious
- genital warts
- treat STI
- and similar terms and phrases.

29. Plaintiff visited VerywellHealth.com while physically present in California.

30. During his visit on various webpages on Defendant's website, Plaintiff searched for information related to medical conditions and treatments.

31. Plaintiff's search terms, page navigation history, and metadata associated with his visit, including his IP address and device identifiers, were intercepted and transmitted to third-party entities without his consent.

32. Plaintiff did not receive any disclosures from Defendant regarding the collection, storage, or transmission of this information prior to or during his visit.

33. Plaintiff had a reasonable expectation that his activity on a health-related website would remain private and that any search queries he entered would not be shared with third parties.

34. Defendant's actions resulted in the unauthorized collection and dissemination of Plaintiff's sensitive online interactions, violating his legally protected privacy interests.

35. As a result of this unlawful conduct Plaintiff has been subject to increased risk of identity theft and digital profiling, where advertisers and third parties now associate Plaintiff's identity with highly sensitive health-related searches.

36. Plaintiff has suffered informational injury, as he was deprived of control over the dissemination of his private online activities.

37. Plaintiff has experienced concrete emotional distress, including anxiety over

8

how his sensitive medical-related searches have been exploited for commercial gain.

**Defendant Has Purposefully Availed Itself To This Forum**

38. The Ninth Circuit Court of Appeals recently held:

> We now hold that if a defendant, in its regular course of business, sells a physical product via an interactive website and causes that product to be delivered to the forum, the defendant "expressly aimed" its conduct at that forum. Though the emergence of the internet presents new fact patterns, it does not require a wholesale departure from our approach to personal jurisdiction before the internet age.

*Herbal Brands, Inc. v. Photoplaza, Inc.,* 72 F.4th 1085, 1093 (9th Cir. 2023)(footnote omitted).

39. Defendant expressly aim its conduct at the State of California and the Southern District of California when it registered itself as a foreign corporation in California and marketed physical products, services, and information to California residents via its website.

40. Defendant publishes a series of travel and vacation guides to support and promote travel in California. https://dotdashmeredithtravel.com/home/visit-california last accessed December 14, 2024.

41. Defendant also maintains an office in Los Angles, California office located at 11766 Wilshire Blvd, Los Angeles, CA.

42. Defendant has very recently actively recruited new employees to work in its Los Angeles office to do just the kind of data mining and technical support for it alleged in this lawsuit that belie its protestations that it has not purposefully directed its business activities to California:

   a. https://www.linkedin.com/jobs/view/3960717272/ (Director – Digital Marketing); and ,

   b. https://www.linkedin.com/jobs/view/3966706227/ (Manager – IT Service Desk), last accessed March 18, 2025.

First Amended Complaint - Class Action

43. Defendant's Los Angeles office serves as a base for various business activities, including content creation, advertising sales, and regional marketing efforts.

44. Additionally, Dotdash Meredith's career listings indicate active recruitment for positions based in their Los Angeles office, further underscoring their continued operational engagement in California.

45. While VerywellHealth.com operates primarily as a digital platform, its affiliation with Defendant Dotdash Meredith links it to the company's physical operations in California.

46. This connection suggests that VerywellHealth.com benefits from and contributes to Dotdash Meredith's business activities within the state.

47. Furthermore, VerywellHealth.com's content has addressed topics pertinent to California residents, such as articles highlighting the state's high ranking in promoting a healthy lifestyle. https://www.verywellhealth.com/how-much-does-your-home-state-impact-your-wellbeing-6273944.

48. In summary, Dotdash Meredith's established office in Los Angeles and its ongoing business operations within California, coupled with VerywellHealth.com's targeted content for the state's residents, illustrate a clear and sustained engagement with the California market.

49. Defendant is also in a $16 million dollar a year partnership with San Francisco, California-based OpenAi which operates CHATGpt to license its content.

50. According to Adweek:

> The artificial intelligence firm OpenAI is paying the digital media company Dotdash Meredith a minimum of around $16 million per year to license its content, according to public financial documents from IAC, the parent company of Dotdash Meredith.

https://www.adweek.com/media/openai-dotdash-meredith-licensing-payment/

last accessed March 18, 2025.

**Defendant's Use of D/Cipher**

51. Defendant actively engages in the collection and monetization of individual user data through its proprietary advertising platform, D/Cipher. *Dotdash Meredith Appoints Jim Lawson as President of D/Cipher*, PR Newswire, March 17, 2025, available at PR Newswire, last accessed March 18, 2025, https://www.prnewswire.com/news-releases/dotdash-meredith-appoints-jim-lawson-as-president-of-dcipher-302403183.html.

52. According to Defendant Dotdash Meredith's own public statements, D/Cipher "analyzes billions of consumer interactions and content signals" across its more than 40 brands, including VerywellHealth.com, to track consumer behavior, infer intent, and optimize ad targeting. Id.

53. Defendant's press release states in part:

   Launched in May 2023, D/Cipher is DDM's ground-breaking intent-targeting advertising solution. D/Cipher doesn't rely on cookies or personal identifiers and instead analyzes billions of consumer interactions and content signals to understand consumers' intent as they explore content across DDM's more than 40 iconic brands. Since launch, D/Cipher has meaningfully outperformed cookies and other audience targeting methods across more than 30 campaigns.

   D/Cipher+ builds on DDM's flagship D/Cipher solution to create a new standard of targeting for the open Internet. Powered by a technology integration with DDM partner OpenAI, D/Cipher+ uses the same data, enhanced targeting technology and AI-powered capabilities as D/Cipher to identify consumer intent anywhere on the Internet – unlocking new brand safe inventory, extended reach and value for performance advertisers with the same performance guarantees.

54. Defendant openly acknowledges that its system is powered by "first-party data of tens of millions of daily users," demonstrating that the company systematically collects, stores, and processes vast amounts of user data to enhance its advertising platform.

11

55. Defendant has recently expanded these capabilities with the introduction of D/Cipher+, an advanced iteration of its data-tracking platform that integrates artificial intelligence through a partnership with OpenAI. Id.

56. This system purports to identify consumer intent "across the premium open web," further evidencing that Dotdash Meredith's data-harvesting operations extend beyond its own digital properties and into the broader online ecosystem.

57. Defendant's own press release states that D/Cipher+ unlocks materially better ad performance, extended reach, brand-safe inventory, and unprecedented value for advertisers, reinforcing the fact that Dotdash Meredith treats individual user data as a core asset for its advertising business. Id.

58. Defendant Dotdash Meredith's business strategy demonstrates a sophisticated and deliberate effort to harvest, analyze, and commercialize user data at scale.

59. In its announcement of D/Cipher's expansion, Dotdash Meredith emphasized that "D/Cipher understands consumers' intent and context-based interests as they explore content, take action and make decisions." Id.

60. These statements confirm that Dotdash Meredith designed its technology to track user behavior in real time, infer individual preferences, and then use those insights to target advertising.

61. Defendant Dotdash Meredith's CEO has publicly acknowledged that its first-party data collection strategies "drive ad performance way more effectively than personal data," an admission that its business model is predicated on data extraction and behavioral profiling.

62. Defendant not only operates a pervasive data-tracking network but does so with full knowledge of its implications for user privacy.

First Amended Complaint - Class Action

63. Defendant has built an entire advertising business around its ability to analyze user behavior and deliver advertisers highly targeted insights derived from users' online activity. Id.

**D/Cipher as a Workaround to Privacy Protections that Still Identifies Users**

64. Defendant publicly represents D/Cipher as a privacy-friendly alternative to cookie-based tracking, claiming it does not rely on traditional personal identifiers.

65. However, D/Cipher's method of reconstructing user identities through aggregated behavioral data and content signals functionally achieves the same outcome as traditional tracking mechanisms—if not more effectively—by compiling and analyzing a user's online activity to create a distinct behavioral fingerprint.

66. According to Defendant's website:

> D/Cipher is a groundbreaking Intent Targeting tool for advertising. This powerful new tool **connects advertisers to consumers in key moments of intent - as they make decisions, take action and pursue passions**, across Dotdash Meredith's more than 40 iconic brands. D/Cipher makes intent-based ad targeting at scale a reality, without cookies. Best of all, D/Cipher reaches *all* users on all devices and unlocks Apple (iOS) audiences.
>
> https://www.dotdashmeredith.com/advertising    (bold    emphasis added) last accessed March 18, 2025.

67. D/Cipher extracts multiple data points from each user session, including:

- The specific articles and topics a user reads.
- The search terms entered on Dotdash Meredith websites.
- The sequence of user navigation, including which pages they visited and in what order.
- Device-related metadata, such as IP address ranges, screen resolution, and browser type.
- Time-based behaviors, including how long a user spends on a given topic and how frequently they return to certain pages.

First Amended Complaint - Class Action

68.    Dotdash Meredith then aggregates these signals into a composite profile, allowing D/Cipher to infer a user's interests, habits, and likely future actions.

69.    Here is how Defendant illustrates how its D/Cipher technology operates:



https://www.dotdashmeredith.com/advertising, last accessed March 18, 2025.

70.    By applying machine-learning models and first-party data modeling, D/Cipher essentially reconstructs an identifiable user profile, even without relying on cookies or explicit personal identifiers.

71.    In fact, Defendant guarantees that its D/Cipher technology is even more effective than cookies, which identifies only a particular browser in use as opposed to the particular **user** accessing that browser. Id.

First Amended Complaint - Class Action

**D/Cipher Circumvents Browser Privacy Controls and Cookie Blocking**

72.  D/Cipher's ability to track users without reliance on cookies or third-party identifiers makes it even more invasive than traditional tracking mechanisms in certain respects.

73.  Privacy-focused browser settings, such as Safari's Intelligent Tracking Prevention (ITP) or Google Chrome's planned third-party cookie deprecation, are specifically designed to prevent companies from persistently tracking individuals across the web.

74.  However, because D/Cipher derives its insights from first-party data collected across Defendant Dotdash Meredith's network, it evades these browser-imposed limitations while still delivering personalized advertising.

75.  Defendant's D/Cipher allows persistent tracking across sessions, because its behavioral analysis is not tied to a single browser session but rather a cumulative record of user interactions across multiple visits.

76.  D/Cipher allows user identification without explicit consent, since the system infers identity based on behavioral patterns instead of requiring logins or explicit tracking mechanisms.

77.  D/Cipher allows cross-device tracking, because it relies on context-based profiling rather than device-specific identifiers, enabling it to connect user behavior across different devices without relying on cookies or mobile ad IDs.

78.  Defendant explicitly markets D/Cipher as a superior alternative to traditional user tracking, boasting that it outperforms cookies and individual-identifier targeting methods in advertising effectiveness. Id.

79.  This admission confirms that D/Cipher's data extraction techniques are as precise—if not more precise—than traditional personally identifiable tracking mechanisms.

80. D/Cipher+ further expands its capability to track users outside of Defendant Dotdash Meredith's owned sites, leveraging AI-powered data modeling to infer consumer intent across the broader internet.

81. This process enables advertisers to target individuals based on a re-created behavioral profile even when those individuals visit unrelated websites.

82. Dotdash Meredith's CEO has acknowledged that their first-party data collection techniques allow them to understand "consumer intent at a given moment", reinforcing that their data-harvesting operation is designed to predict and influence user behavior in real time. https://www.prnewswire.com/news-releases/dotdash-meredith-appoints-jim-lawson-as-president-of-dcipher-302403183.html, last accessed March 18, 2025.

83. This process directly aligns with the legal definition of behavioral tracking under privacy laws such as the California Consumer Privacy Act (CCPA) and the California Invasion of Privacy Act (CIPA), as it collects and processes user-generated data without direct disclosure or affirmative consent.

84. D/Cipher's tracking practices violate multiple consumer privacy statutes because they achieve the same function as prohibited tracking methods while evading conventional oversight, for example:

- **CIPA (California Invasion of Privacy Act § 631):**
  - D/Cipher's real-time interception of user interactions constitutes a wiretap under California law because it captures user inputs (search terms, page visits) as they are entered into the website, before the content is fully loaded.
  - This is functionally equivalent to session replay technologies that have been found to violate CIPA because they allow an entity to observe and record a user's engagement with a website without consent.

16

- o The use of AI-powered modeling in D/Cipher+ extends this surveillance beyond the first-party website, effectively eavesdropping on users as they browse unrelated websites.
- **California Consumer Privacy Act (CCPA):**
  - o D/Cipher operates as a data broker, collecting behavioral and contextual insights about users without direct consent and monetizing those insights through targeted advertising.
  - o CCPA grants consumers the right to know what personal information is collected and sold, but Dotdash Meredith does not explicitly disclose the extent of D/Cipher's tracking capabilities.
- **Wiretap Act (18 U.S.C. § 2511):**
  - o The Wiretap Act prohibits unauthorized interception of electronic communications, including the real-time capture of user interactions with a website.
  - o Courts have found that third-party tracking pixels and session replay software constitute an illegal interception when they capture sensitive data such as search queries, financial transactions, or health-related browsing behavior.
  - o Because D/Cipher functions as an AI-enhanced tracking and re-identification tool, its data aggregation methods raise serious legal concerns under federal wiretapping statutes.

**D/Cipher Replicates the Function of Personally Identifiable Tracking Without Explicit User Consent**

85.  Despite its claim of avoiding personal identifiers, Defendant's D/Cipher constructs behavioral profiles detailed enough to re-identify individual users based on a series of contextual signals.

86.  It effectively bypasses browser privacy protections, evades cookie-blocking technologies, and monetizes user behavior in real time without consent.

17

First Amended Complaint - Class Action

87. These practices violate core principles of CIPA, CCPA, and the Wiretap Act, exposing Defendant to liability for the unlawful collection and commercialization of user data in violation of these and other laws.

88. By positioning itself as a privacy-compliant solution while achieving the same results as traditional tracking, D/Cipher operates a deceptive and invasive data-extraction business model that disregards established consumer privacy protections.

**Objection to Declaration of James Vint**

89. Plaintiff's allegations do not rest on the premise that his IP address alone was the mechanism by which he was identified.

90. Defendant's attempt to reduce this case to an argument about whether an IP address can, in isolation, identify a user is a non sequitur.

91. The Vint Declaration focuses narrowly on the claim that an IP address does not provide definitive personal identification, while entirely ignoring the fact that Defendant, in conjunction with D/Cipher, Google Analytics, and other third-party tracking companies, systematically identifies and tracks users across the internet through cross-site tracking technologies that do not depend on cookies or IP addresses. See *Declaration of James Vint in Support of Defendant's Motion to Dismiss*, Maghoney v. Dotdash Media, Inc., No. 3:24-cv-02394-AJB-AHG (S.D. Cal. Mar. 12, 2025), ECF No. 15-3.

92. Defendant's website, in combination with its use of D/Cipher, intercepts and fingerprints individual users through a variety of unique browser characteristics, device attributes, and behavioral signals that allow for persistent identification independent of IP address.

93. The very purpose of cross-site tracking technologies is to enable companies like Defendant to identify and profile users even when they change locations, networks, or devices.

First Amended Complaint - Class Action

94.  These technologies analyze device fingerprinting, user agent strings, screen resolution, font preferences, and browsing patterns to create a unique and enduring user profile, ensuring that Defendant and its third-party spyware companies can track users irrespective of what internet connection they are using at any given time.

95.  The assertion that Plaintiff's IP address is necessary for him to be identified is akin to arguing that a person cannot be identified simply because they are driving a different car. A vehicle may change, but a person can still be identified by countless other attributes—their height, gait, face, clothing, or the way they interact with the world.

96.  Defendant's tracking systems operate the same way: whether Plaintiff accessed the website from his home, a public WiFi network, or through a mobile connection, Defendant's technologies intercepted his search terms instantaneously, fingerprinted his device and behavior, and transmitted that data to third parties for monetization, regardless of what IP address was associated with the request.

97.  By focusing on the alleged limitations of IP addresses, Defendant attempts to distract from the core privacy violations at issue—that Plaintiff's sensitive medical search queries were unlawfully intercepted in real-time and transmitted to third parties without his knowledge or consent.

98.  Whether Defendant used an IP address as part of its fingerprinting methods is entirely irrelevant to the fact that Plaintiff's searches were identified, extracted, and transmitted for targeted advertising and user profiling, which is the core violation at issue in this case.

99.  The Vint Declaration is an attempt to create a strawman argument, reframing Plaintiff's allegations into something they never were.

100.  Plaintiff does not claim that he was identified solely through his IP address, but rather that Defendant and its spyware partners tracked and intercepted his

private searches through advanced digital fingerprinting techniques that function independently of IP address identification.

101. This lawsuit is about the interception and monetization of Plaintiff's confidential medical searches—not about whether an IP address, standing alone, reveals his name, since it indisputably does not.

### Harm to California Residents

102. Defendant knew that it was going to harm California residents by enabling Google and other Spyware Companies to wiretap the residents' communications and that Defendant intended to wiretap those communications in California.

103. Plaintiff also alleges that Defendant knows specifically which users are in California, including Plaintiff, and that Defendant knew this, continuously, as a result of its specific website code and interactive capabilities above and beyond its website's mere functionality as a nationally accessible, informational website. Dotdash maintains significant and continuous contact with California beyond merely operating a website accessible nationwide.

104. Defendant actively markets and monetizes California consumers through state-targeted advertising partnerships with Google and others located in California, and it has a physical office in Los Angeles.

105. By its own admission, Defendant employs over 210 California persons, hardly the kind of tenuous or incidental presence that would suggest a lack of meaningful contacts with the state.

106. Defendant's use of California-specific advertising technology and data tracking infrastructure demonstrates purposeful availment of this forum.

107. In addition, Dotdash's own business registrations in California, as well as data collection practices that specifically track user geolocation, establish personal jurisdiction under well-settled Ninth Circuit precedent.

First Amended Complaint - Class Action

108.  As previously alleged, Defendant affirmatively engaged with Plaintiff's data for advertising and marketing purposes, and the content of Plaintiff's website activity and geolocation information within California was intercepted in real time and while in transit, tracked and shared, including specific search terms typed by Plaintiff during visits to Defendant's website.

109.  Thereafter, that content was instantly communicated by Defendant to third-party spyware companies for purposes of targeting advertising to Defendant's California website users.  Plaintiff's allegations are thus about the knowing and intentional illegal conduct of Defendant's tied directly to the forum.

110.  The Supreme Court has confirmed that contacts may be considered in the jurisdictional inquiry because the "aris[ing] out of or relat[ing] to" standard does not require proximate causation between the contacts and the cause of action but instead "contemplates that some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 361-62 (2021) (emphasis added).

111.  This issue was recently addressed in another case involving privacy claims, *Swarts v. Home Depot, Inc.*, 2023 WL 5615453 (N.D. Cal. Aug. 30, 2023):

> Home Depot contends that Swarts's "generic allegations about Home Depot's sales and business contacts in California fail the but-for test because they are too attenuated from Home Depot's alleged recording of Swarts' chats to support personal jurisdiction." . . . Put differently, Home Depot argues that jurisdiction only attaches if Defendant's forum contact gave rise to the claim at issue.  But such a view of the "but-for test" reads the caselaw too narrowly.  As Ford Motor Co. makes clear, the plaintiff need not establish "a strict causal relationship between the defendant's in-state activity and the litigation" to satisfy this element. . . . Rather, the suit must only 'arise out of or relate to the defendant's contacts with the forum.' . . . At the very least, Swarts's claim that Home Depot recorded online chat conversations concerning products he had purchased without his consent relates to Home Depot's connection with the forum, and that

is sufficient for this element to be satisfied.") (internal citations and emphases omitted).

*Id.* at *4-5.

112. Defendant Dotdash Meredith Inc. expressly directs its online activities toward California consumers and generates substantial revenue from California-based website visitors.

113. Defendant contracts with California-based data brokers and analytics firms, to commercialize consumer data including the following California-based data brokers:

- Google – Mountain View, California
- DoubleClick (Google subsidiary) – Mountain View, California
- TrustArc – San Francisco, California
- LiveRamp – San Francisco, California
- The Trade Desk – Ventura, California
- BlueCava – Irvine, California

114. Defendant collects and retains data from California consumers, including Plaintiff, for behavioral tracking and ad personalization, constituting sufficient minimum contacts under *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017).

115. Unlike the *Smith* and *Valenzuela* cases as discussed more further below, where courts dismissed claims due to a lack of defendant knowledge, Defendant Dotdash Meredith designed, marketed, and profited from the very tracking mechanisms at issue.

116. Defendant's direct role in harvesting and monetizing users' confidential medical data establishes a clear basis for liability under CIPA, the Wiretap Act, the Stored Communications Act, and California's privacy laws.

117. Defendant may attempt to rely upon the Ninth Circuit's recent decision in *Briskin v. Shopify, Inc.*, 2023 WL 8225346 (9th Cir. Nov. 28, 2023) to

First Amended Complaint - Class Action

support the argument that Defendant's advertising and sales targeting California may not be considered in deciding whether Plaintiff has established the required "something more" needed for personal jurisdiction. However, that case is distinguishable. In *Briskin*, the plaintiff brought a putative class action alleging *Shopify*—a back-end, payment-processing platform—violated various California privacy laws when it collected and retained his personal data. In conducting the jurisdictional inquiry, the court declined to consider *Shopify's* "broader business activities in California outside of its extraction and retention of the plaintiff's data," because whether *Shopify* had a brick-and-mortar store or had contracts with California merchants had "nothing to do" with the alleged data-privacy injuries. *Briskin*, 2023 WL 8225346, at *5.

118. Defendant may attempt to exploit this narrow holding, ignoring the obvious differences between *Briskin* and what Plaintiff has alleged in this case. *Shopify* received data from third-party merchants and was ultimately "indifferent to the location of end users." *Briskin*, 2023 WL 8225346, at *1. Here, as discussed, Plaintiff's claims directly relate to—and in fact arise from—Defendant's attempts to cultivate the California market. Additionally, *Shopify* simply made its platform accessible through a third-party site that happened to be accessible in California. Id. at *5. Meanwhile, Defendant has specifically targeted California residents with marketing, use, and sales of its website sales and pharmaceutical services. Further, in *Briskin*, the defendant passively gathered information from individual consumers, that was supplied by merchants, who were themselves "engaged in independent transactions that themselves do not depend on consumers being present in California." Id. As a result, the plaintiff in *Briskin* could have been anywhere when he suffered the alleged injury, and plaintiffs from anywhere could have brought the same claims. Here, the injuries to Plaintiff are specific to

California, where Plaintiff resided when the communications on Defendant's website were intercepted in real time and while in transit.

119. In sum, Defendant took various steps to cultivate an audience and market in California and induce residents in that forum to review and use Defendant's interactive website.  This is sufficient to establish the "something more" required for personal jurisdiction based on privacy claims arising from that website.

## Fair Play and Substantial Justice

120. Defendant did substantial business directed at California consumers through its website, and that that website contained the SDKs and spyware plugins that caused the harm to Plaintiff and the other Class Members.

121. Moreover, Plaintiff's claims herein arise out of Defendant's specific activities within this forum, namely, unlawfully intercepting personal communications and information in a manner that violates California consumer protection laws.  Those claims would not exist but for the manner in which Defendant developed and deployed its website in California to market and deliver physical goods and services into California.   See *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

122. The exercise of general and personal jurisdiction over Defendant is reasonable and just in this case, especially in light of Defendant's substantial business activities in California; its purposeful availment to this jurisdiction.

123. Rather than a mere "hunch that [discovery] might yield jurisdictionally relevant facts," Plaintiff has alleged more than sufficient specific pre-discovery facts herein to show that the exercise of both general and personal jurisdiction over this Defendant is both fair play and substantial justice. *Boschetto v. Hansing,* 539 F.3d 1011, 1020 (9th Cir. 2008).

## FACTUAL ALLEGATIONS

### Background of the California Information Privacy Act

First Amended Complaint - Class Action

124.    The California Information Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

125.    To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

126.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" including computers, the internet, and email. *See*

*Matera v. Google Inc.*, 2016 WL 8200619, at \*21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at \*5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

127. Under California Penal Code § 637.2, Plaintiff and Class Members may seek injunctive relief and statutory damages of $5,000 per violation.

**Background of the California Confidentiality of Medical Information Act**

128. Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a). "An authorization for the release of medical information . . . shall be valid if it:

(a) Is handwritten by the person who signs it or is in a typeface no smaller than 14- point type.

(b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c) Is signed and dated . . .

(d) States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

First Amended Complaint - Class Action

(f)    States the name or functions of the persons or entities authorized to receive the medical information.

(g)    States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(h)    States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i)    Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

129.    Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[3] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

130.    In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient. *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

27

131.  Finally, "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101, subd. (a).

### Google's Platform and its Business Tools

132.  Google's platform and business tools represent a comprehensive ecosystem of products and services designed to support businesses in understanding and engaging with their audiences. Central to this ecosystem is Google Analytics, a widely-used web analytics service that enables website owners to track and analyze visitor behavior on their sites. Google Analytics is a critical tool for measuring the effectiveness of digital marketing efforts, optimizing user experience, and gaining insights into customer interactions. https://support.google.com/analytics/answer/12159447 last accessed December 14, 2024.

133.  The primary purpose of Google Analytics is to collect, process, and report on data generated by user activity on a website. This includes tracking page visits, session durations, referral sources, and user interactions, such as clicks, form submissions, and search queries. By analyzing this data, businesses can make data-driven decisions to improve website performance and enhance their online strategies.

134.  Google Analytics is installed on websites through the addition of a small piece of JavaScript code provided by Google. This script is embedded into the HTML code of a website, typically in the header section. Once installed, the script automatically tracks user interactions and sends the collected data to Google's servers for processing. The data is then made available to website

owners through the Google Analytics dashboard, where they can access detailed reports and insights. Id.

135. The intention of Google Analytics is to empower businesses with actionable information about their online presence. By understanding how users find and interact with their websites, businesses can identify areas for improvement, optimize their content, and increase conversions. For example, tracking the performance of specific marketing campaigns allows businesses to allocate resources more effectively and maximize their return on investment.

136. Google Analytics also enables advanced functionality, such as audience segmentation, e-commerce tracking, and event tracking. Audience segmentation allows businesses to group users based on shared characteristics, such as demographics, location, or behavior, enabling personalized marketing efforts. E-commerce tracking provides insights into sales performance, product popularity, and customer purchase paths. Event tracking helps businesses monitor specific user actions, such as video plays or downloads. https://support.google.com/analytics/answer/12799087 last accessed December 14, 2024.

137. One of the core components of Google Analytics is its ability to integrate with other Google services, such as Google Ads and Google Tag Manager. These integrations allow businesses to align their marketing and advertising efforts with the insights provided by Google Analytics. For instance, combining Google Ads with Analytics data helps businesses understand which keywords and ad placements drive the most traffic and conversions.

138. Despite its benefits, the use of Google Analytics raises privacy concerns due to its extensive data collection capabilities. When users visit a website with Google Analytics installed, their interactions and device information are logged and associated with unique identifiers, such as cookies. While Google

First Amended Complaint - Class Action

provides options to anonymize data, such as masking IP addresses, concerns remain regarding the potential for tracking user behavior across multiple sites and linking data to user profiles.

139. Defendant's argument that IP addresses do not identify individual users is misleading and ignores the reality of modern data-tracking technology.

140. Through a *combination* of IP addresses, browser fingerprints, cookies, software, and/or other device identifiers, Dotdash creates highly individualized user profiles, allowing for targeted behavioral tracking.

141. Defendant's analytics scripts also extract search terms entered by users regarding specific medical conditions, which are then transmitted to third-party advertising networks.

142. The collection and dissemination of these identifiers constitute an invasion of privacy and an economic injury, as they deprive consumers of control over their own medical data and enable targeted advertising without consent.

143. Google itself has recognized the risks inherent in attribution to individual users for unique events and information transmitted and has itself recommended the use of banner ads at the bottom of websites to advise users of the use of this type of tracking and interception technology and provided a means by which website developers who use Google analytics on their websites can lawfully obtain that consent from users before engaging in illegal interception or data sharing. "To capture valuable insights while protecting user privacy, you need to collect consent from your website users. We recommend you use a Consent Management Platform (CMP) or work with your Content Management System (CMS) to collect consent and send it to Google." https://support.google.com/analytics/answer/14565698 last accessed December 14, 2024.

144. As a result of its activities and operation of the Google Analytics Tag and other third-party software on its website, Google and the other third-parties

listed below are able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.

145.    The personal information and communications obtained by Google and the other third parties are used to fuel various services offered via Google Analytics including targeted advertising, audience matching, and the like.

146.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.

147.    Google Analytics Tag is a JavaScript-based code which allows for the installation of its software that allows it to track users, even when third-party cookies are blocked.

148.    Third-party cookie-blocking functions of modern web browsers do not prevent Google or these other third parties from collecting data through their software on Defendant's website.

149.    Google and these other third parties never receive consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.

150.    Similarly, Defendant never receives consent from users to share medical information with Google and these other third parties.

151.    Users never choose to provide sensitive information to Google or the others because, among other reasons, they never know whether a particular website uses the Google Analytics Tag, and, if so, what sensitive personal data it collects.

152.    Moreover, the Defendant never provides any notice to visitors of his website that there's sensitive personal medical information entered into the search bar at the top of the website page will be shared with third-party advertising and

First Amended Complaint - Class Action

1      tracking companies, such as Google and these others.

2    153.   From the instant that a visitor to defendants website arrives on its homepage,

3      that visitors interactions are being immediately recorded, intercepted in real

4      time and while in transit, and transmitted in real time simultaneously from

5      that webpage to google, and these other third parties.

6    154.   Defendant does not provide any sort of pop-up, click wrap agreement, or

7      banner ad, of any sort for alerting its website visitors such as the Plaintiff

8      and the Other Class Members that their sensitive medical information will be

9      intercepted in real time and while in transit, and sent to third parties

10      simultaneously with its transmission to the Defendant.

11    155.   Defendant does not offer or require any sort of action on the part of a website

12      visitor, which would provide that visitor with notice of Defendant's real time

13      data interception practices or permit planner for other members of the class

14      the opportunity to have notice, and provide consent for these data practices.

## How A Medical Website Like Defendant Transmits, Confidential Medical Information Through GET And POST Requests

17    156.   A GET request is an HTTP method used by a web browser or application to

18      retrieve specific information from a server. It is commonly employed when

19      a consumer enters a search term, navigates to a particular page, or interacts

20      with a website's interface.

21    157.   The purpose of a GET request is to send a request to the server, which then

22      returns the requested resource, such as a webpage or data. Importantly, the

23      data sent via a GET request is appended to the URL in plain text, making it

24      inherently unencrypted and visible in the browser's address bar.

25    158.   Because GET requests transmit data in the open through the URL, any private

26      information included, such as search terms, can be exposed. For example,

27      when a consumer searches for medical symptoms or conditions on a website,

28      those search terms can become part of the visible URL.

First Amended Complaint - Class Action

159.   This means that any third parties monitoring the connection, including advertisers or analytics companies, can potentially intercept and record this information. The inclusion of such sensitive data in GET requests creates a significant privacy risk, particularly when dealing with medical or other confidential information.

160.   Additionally, GET requests can simultaneously transmit data to third-party websites without the consumer's knowledge or consent. Through the use of tracking scripts and embedded links, a website can forward the URL, including the GET request data, to third-party entities such as advertising networks or analytics providers.

161.   Defendant's use of JavaScript tracking tags, session replay scripts, and event-driven analytics tools functions as an unauthorized wiretap, allowing it to intercept and review communications between users and the website in real-time.

162.   The Ninth Circuit has repeatedly held that such passive data collection methods constitute a violation of the Wiretap Act when they occur without user consent.

163.   Plaintiff's testing of the website demonstrates that search queries are captured and simultaneously transmitted by Defendant in real time to these Spyware companies.

164.   This form of real-time surveillance is equivalent to wiretapping under 18 U.S.C. § 2511 and violates users' reasonable expectation of privacy.

165.   These third parties, like Google Analytics or similar Spyware services, can then collect, store, and process this sensitive information for their own purposes, effectively spying on the consumer's browsing activity.

166.   A POST request, by contrast, is an HTTP method used to send larger amounts of data from the consumer to a server, often as part of form submissions or account interactions.

33

167. POST requests are designed to transmit data in the body of the HTTP request rather than in the URL, which can offer better protection for sensitive information.

168. However, POST requests are not inherently encrypted, meaning that without the use of secure protocols such as HTTPS, the data transmitted via POST requests remains vulnerable to interception by third parties.

169. In the context of websites that deal with sensitive consumer information, such as healthcare or financial platforms, POST requests can carry private data including names, email addresses, medical history, or even insurance information. This information, if unencrypted, can be intercepted and accessed by unauthorized parties, leading to breaches of confidentiality and consumer trust.

170. Furthermore, POST requests can also be configured to forward this sensitive data to third-party entities, often without the consumer's awareness or informed consent.

171. The unauthorized use of POST requests to transmit private medical data to third parties is particularly egregious in the context of consumer privacy rights.

172. When a consumer enters sensitive health information on a website, they reasonably expect that this data will be handled confidentially and used only for its intended purpose. However, many websites utilize embedded tracking codes that surreptitiously forward this information simultaneously, instantaneously, and in realtime to third-party analytics or advertising companies.

173. These practices expose consumers to potential harm, including discrimination, identity theft, or unauthorized profiling.

174. Both GET and POST requests, when misused, create a scenario where the consumer's private data is transmitted in the open and shared without consent.

34

175.    Websites that fail to implement adequate safeguards or notify consumers about these practices undermine consumer trust and violate their privacy rights.

176.    The unencrypted transmission of search terms, medical data, or other personal information through these HTTP methods constitutes a significant breach of confidentiality, especially when such data is shared with or accessible by third-party entities.

177.    In the digital age, where consumers increasingly rely on websites to access critical information and services, the integrity and confidentiality of their interactions must be protected.

178.    The misuse of GET and POST requests to disclose or transmit private consumer data, particularly sensitive medical information, without explicit consent or transparency, violates fundamental principles of data privacy and consumer protection.

179.    The contents of **Figure 1** below clearly demonstrate that Defendant utilized both GET and POST requests to transmit massive amounts of confidential medical information. This information, which was individually identifiable, was transmitted without encryption or consent and was tied directly to Plaintiff and other Class Members.

180.    Such actions represent a grave breach of trust and privacy, as the transmitted data included sensitive and personal medical information that should have been safeguarded by Defendant.

181.    The evidence provided highlights the systematic and reckless manner in which Defendant facilitated the unauthorized disclosure of individually identifiable medical information, causing harm to Plaintiff and other Class Members.

**How Defendant Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted with Intercepting Communications**

182. Defendant's patients like Plaintiff and other Members of the Class access the Website to search for information about personal medical needs that they may have.

183. Unbeknownst to Plaintiff, Google and the other unrelated third parties ("Spyware Companies") were tracking their activity the moment they entered the Defendant's Website.

184. For example, Defendant embedded the Google Analytics Tag on the Website, which allowed Google to intercept and record "click" events and specific search terms that Plaintiff entered into he website's search bar at the top of each page. Click events detail information about which page on the Website the patient was viewing as well as the selections and search terms they were using.

185. Google and the other Spyware Companies intercept information including the specific medical search term they were searching for along with a whole host of other personally, identifying information, transmitted, instantaneously to Google, in order to uniquely identify the user and the device accessing Defendant's website.

186. By installing the Google Analytics Tag on the Website, Defendant assisted Google with intercepting patients' confidential information related to their medical needs in order to monetize that data for targeted advertising and other purposes.

187. By installing the software code from these other Spyware Companies, Defendant assisted these Spyware Companies with intercepting patients' confidential information related to their medical needs in order to monetize that data for targeted advertising and other purposes.

188. These interceptions also included a variety of personally identifying information which Google and the Spyware Companies then utilized to identify its account holders for targeted advertising.

36

First Amended Complaint - Class Action

189.  Google and the Spyware Companies used the sensitive medical information it intercepted in real time and while in transit from Defendant's Website into its marketing tools to fuel its targeted advertising service.

190.  Plaintiff never consented, agreed, authorized, or otherwise permitted Google and the Spyware Companies to intercept his confidential health information.

191.  Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share his confidential health information with Google and the Spyware Companies.

192.  By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.

193.  Defendant deprived Plaintiff of his privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**Testing Demonstrates that Defendant's Website Share Sensitive Medical Information without Consent with Google and the Spyware Companies**

194.  During routine investigation of the Defendant's VerywellHealth.com website, analysis of its network traffic revealed significant transmission of user search term data to numerous third-party entities including Google, Amazon, and numerous others.

195.  The investigation focused on requests generated during a user search for the term "diabetes," which were recorded in the HAR file provided.

196.  The analysis revealed that Google Analytics received POST requests containing the search term "diabetes" as part of the payload, specifically through the parameter ep.search_term.

197.  This data transmission to Google Analytics enabled the collection of sensitive user information, associating it with session and device identifiers for detailed behavioral tracking.

198. DoubleClick, through its endpoint at https://securepubads.g.doubleclick.net, processed GET requests that included the search term "diabetes" in the Referer header.

199. DoubleClick's collection of this data facilitates targeted advertising by linking the user's sensitive search term to advertising profiles.

200. Criteo, through its synchronization endpoint at https://gum.criteo.com, likely received information linking the search term "diabetes" to user behavior, enabling its advertising retargeting services.

201. ScorecardResearch, a division of ComScore, received data at https://sb.scorecardresearch.com including the user's search term, allowing the platform to aggregate sensitive health-related metrics for market analysis.

202. The endpoint https://sync.graph.bluecava.com belonging to BlueCava (or Relay42) received requests that potentially linked the search term "diabetes" with user device fingerprints and behavioral profiles.

203. HawkLogServer at https://r.3gl.net/hawklogserver/r.p collected event data that included health-related interactions associated with the search for "diabetes."

204. LiveRamp, through its ID synchronization endpoint at https://idsync.rlcdn.com, processed requests linking sensitive health queries like "diabetes" to unique user identifiers for cross-platform tracking and advertising purposes.

205. This is by no means a complete list of all of the Spyware Companies which may have received which may have received some of all parts of Plaintiff's sensitive private medical information in search terms.

206. Rather it is simply an abbreviated set of examples of the massive amount of personally identifiable, sensitive medical user data, which is being transmitted by defendant in real time to Google and these other Spyware Companies.

38

207.  Defendant argues that the collection of user search terms and browsing activity is not highly offensive, but this contradicts recent federal enforcement actions against similar data-sharing practices.

208.  In *FTC v. GoodRx* (2023) and *FTC v. BetterHelp* (2023), regulatory agencies fined companies for transmitting user health-related data to advertisers without consent, recognizing the practice as a severe privacy violation. https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; and, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising, last accessed March 18, 2025.

209.  Here, Defendant's conduct is even more egregious because users like Plaintiff have no visible disclosure that their search queries are being intercepted and shared.

210.  Courts have consistently held that the unauthorized collection of medical-related data is one of the most invasive forms of privacy violations, warranting strict liability under consumer protection statutes.

211.  The Verywell Health website's integration with these third-party services demonstrates widespread transmission of sensitive user information, often without explicit user consent or adequate anonymization.

212.  The inclusion of the unencrypted search term "diabetes" in both GET and POST requests, along with session and device identifiers, creates a significant risk of user profiling and data misuse.

213.  The data-sharing practices identified in this investigation identify massive violations of user privacy expectations and violate numerous applicable laws regulating sensitive health information.

214.  Google and each of these third-party Spyware Companies has collected or processed sensitive health-related search terms from Plaintiff and the other

39

Class Members, amplifying privacy risks and exposing users to potentially unauthorized data profiling.

215.   Below as Figure 1 is a summary of some of the websites identified during testing that received the search term "diabetes" in real time from Defendant's website search term testing (with the use of XXXX to de-identify unique IDs):

**Figure 1.**

| HTML REQUEST | WEBSITE RECIPIENT OF SENSITIVE MEDICAL SEARCH ("DIABETES") | PURPOSE OF THIRD-PARTY WEBSITE |
|---|---|---|
| GET | https://www.googletagmanager.com/gtm.js?id=GTM-5P3SXXXX | Google Tag Manager script, used for managing and deploying marketing and analytics tags on websites efficiently. |
| GET | https://securepubads.g.doubleclick.net/tag/js/gpt.js | DoubleClick for Publishers script for managing and serving programmatic advertisements across web properties. |
| GET | https://privacy-policy.truste.com/privacy-seal/seal | TrustArc privacy seal, used to certify and demonstrate compliance with privacy standards and regulations. |
| GET | https://c.amazon-adsystem.com/aax2/apstag.js | Amazon Advertising System script for header bidding, enabling real-time competition for ad placement to maximize revenue. |
| GET | https://d30qdagvt44524.cloudfront.net/production/segments?muid=f8d05118-b223-42e9-8632-b2a10986XXXX | CloudFront endpoint serving segmentation data, typically used for targeted advertising or content personalization. |
| GET | https://js-sec.indexww.com/ht/p/184003-5219060880XXXX.js | Index Exchange header bidding script, enabling real-time bidding for advertisements across multiple demand partners. |

First Amended Complaint - Class Action

| GET | https://b-code.liadm.com/a-07su.min.js | LiveIntent advertising and tracking script, used for delivering personalized ads and measuring engagement across email and web platforms. |
|---|---|---|
| GET | https://i.liadm.com/s/c/a-07su?duid=c5357d20006e--01jf100p92zhb2fj3d5388XXXX&euns=0&s=&version=v3.6.0&cd=.verywellhealth.com&pv=d18c42b1-73e0-48a9-846c-a0b4b673XXXX | |
| GET | https://securepubads.g.doubleclick.net/pagead/managed/js/gpt/m20241209XXXX/pubads_impl.js | DoubleClick for Publishers (DFP) script for managing and serving programmatic advertisements across web properties. |
| GET | https://www.googletagmanager.com/gtag/js?id=G-XMRMNPXXXX&l=dataLayer&cx=c&gtm=45He4cc1v813527222zXXXX | Google Tag Manager script for tracking and analytics. |
| GET | https://api.rlcdn.com/api/identity?pid=2&rt=envelope | LiveRamp API endpoint for user identity resolution, enabling cross-device and cross-platform tracking for targeted advertising and audience analytics. |
| GET | https://id.sv.rkdms.com/identity/?vendor=idsv2&sv_cid=5274_04512&sv_pubid=MEREDITH&sv_domain=www.verywellhealth.com | RKDMS (LiveRamp subsidiary) identity resolution service, used to match user data across platforms and associate it with the Meredith media group for targeted advertising and audience insights. |
| GET | https://match.adsrvr.org/track/rid?ttd_pid=casale&fmt=json&p=1840XXXX | The Trade Desk's user ID matching service for syncing user identifiers across advertising platforms, enabling targeted and programmatic ad delivery. |

First Amended Complaint - Class Action

| GET | https://match.adsrvr.org/track/rid?ttd_pid=uy uXXXX &fmt=json | |
| GET | https://gum.criteo.com/sid/json | Criteo's ID synchronization service, used for mapping user identities across platforms for personalized retargeting and ad delivery. |
| GET | https://c.amazon-adsystem.com/bao-csm/aps-comm/aps_csm.js | Amazon Advertising script for targeted ads. |
| GET | https://rp.liadm.com/j?dtstmp=173420372XX XX&aid=a-07su&se=e30&duid=c5357d20006e--01jf100p92zhb2fj3d5388XXXX&tv=v3.6.0&p u=https%3A%2F%2Fwww.verywellhealth.co m%2Fsearch%3Fq%3Ddiabetes&ext_global TI_SID=f8d05118-b223-42e9-8632-b2a10986XXXX&ext__sharedid=cc305da6-369b-4c92-be58-ddbbab3bXXXX&wpn=lc-bundle&wpv=v3.6.0&refr=https%3A%2F%2 Fwww.verywellhealth.com%2F&cd=.verywell health.com&c=XXXXbmsgcmVsPSJjYW5vb mljYWwilGhyZWY9Imh0dHBzOi8vd3d3LnZl cnl3ZWxsaGVhbHRoLmNvbS9zZWFyY2giP jx0aXRsZT5bZGlhYmV0ZXNdIFJlc3VsdHM gZnJvbSBWZXJ5d2VsbDwvdGl0XXXX&pv= d18c42b1-73e0-48a9-846c-a0b4b673XXXX | |
| GET | https://www.google-analytics.com/privacy-sandbox/register-conversion?_c=1&cid=91763XXXX.173412 XXXX&dbk=156556681591862XXXX&dma=0&en=view_search_results&gtm=45je4cc1v 9117030087za200zb81352XXXX&npa=0&ti d=G-XMRMNPXXXX&dl=https%3A%2F%2Fwww .verywellhealth.com%3F | Google Analytics conversion tracking endpoint, used for measuring interactions such as search result views and conversions, while leveraging Google's Privacy Sandbox to minimize third-party cookie usage. |
| GET | https://www.google-analytics.com/privacy-sandbox/register-conversion?_c=1&cid=91763XXXX.173412 XXXX&dbk=11080535595XXXX XXXX&dma=0&en=page_view&gtm= XXXXcc1v9117030087z8813527222za200z | |

First Amended Complaint - Class Action

| | | | |
|---|---|---|---|
| 1<br>2 | | *b81352XXXX&npa=0&tid=G-XMRMNPXXXX&dl=https%3A%2F%2Fwww.verywellhealth.com%3F* | |
| 3<br>4<br>5<br>6<br>7<br>8 | *GET* | *https://www.google-analytics.com/privacy-sandbox/register-conversion?_c=1&cid=91763XXXX.173412XXXX&dbk=1108053559549321XXXX&dma=0&en=page_view&gtm=45je4cc1v9117030087z8813527222za200zb81352XXXX&npa=0&tid=G-XMRMNPB3BJ&dl=https%3A%2F%2Fwww.verywellhealth.com%3F* | |
| 9<br>10<br>11<br>12<br>13<br>14<br>15<br>16 | *GET* | *https://sb.scorecardresearch.com/b?c1=2&c2=603XXXX&cs_it=m9&cv=4.11.0%2B241206XXXX&ns__t=173420372XXXX&ns_c=UTF-8&cs_cfg=1101XXXX&cs_fpid=f8d05118-b223-42e9-8632-b2a10986XXXX&cs_fpit=lo&cs_fpdm=\*null&cs_fpdt=\*null&c7=https%3A%2F%2Fwww.verywellhealth.com%2Fsearch%3Fq%3Ddiabetes&c8=%5Bdiabetes%5D%20Results%20from%20Verywell&c9=https%3A%2F%2Fwww.verywellhealth.com%2F* | *ScorecardResearch data beacon, used for tracking user behavior and collecting audience measurement metrics for market analysis.* |
| 17<br>18 | *GET* | *https://sb.scorecardresearch.com/cs/6036XXXX/beacon.js* | |
| 19<br>20<br>21 | *GET* | *https://ak.sail-horizon.com/spm/spm.v1.min.js* | *Sailthru script for personalized content delivery and email marketing, used to track user engagement and preferences.* |
| 22<br>23<br>24 | *GET* | *https://idsync.rlcdn.com/4599XXXX.gif?partner_uid=f8d05118-b223-42e9-8632-b2a10986XXXX* | *LiveRamp ID synchronization endpoint, used for mapping user identifiers across platforms to enhance ad targeting and analytics.* |
| 25<br>26<br>27<br>28 | *GET* | *https://sync.graph.bluecava.com/ds.png?p=9274e5db-ddcb-11ea-a80b-0242ac11XXXX&segment=4l28r4sz3bl3555wt2hyave1w6u6XXXX&uid=&CampaignID=303C&Channel=verywellhealth&CreativeID=&* | *BlueCava device synchronization service, used for device fingerprinting and associating user data across* |

43

First Amended Complaint - Class Action

| | | |
|---|---|---|
| | Placement=undefined&MAID=&Keyword=&Medium=&Source=&PageName=www.verywellhealth.com%2Fsearch&Event=&Key1=&Key2=&Key3=&Key4=&Key5= | campaigns and platforms for targeted advertising. |
| GET | https://privacy-policy.truste.com/privacy-seal/seal?rid=33c36249-6102-4b62-8673-787e6e34XXXX | TrustArc privacy certification seal. |
| POST | https://r.3gl.net/hawklogserver/r.p | HawkLogServer endpoint used for logging and tracking application events, user activities, and performance metrics for analytics purposes. |
| POST | https://www.google-analytics.com/g/collect | Google Analytics endpoint for collecting user interaction data, including page views, events, and session details for website analytics. |
| POST | https://www.google-analytics.com/g/collect | |
| POST | https://www.google-analytics.com/g/collect | |
| POST | https://www.google-analytics.com/g/collect | |
| POST | https://www.google-analytics.com/g/collect | |
| POST | https://www.google-analytics.com/g/collect | |

216. Contrary to Defendant's claim that VerywellHealth.com is merely a health publication, the website actively collects and disseminates users' health-related search data, making it functionally equivalent to a digital health platform.

217. Defendant prominently markets itself as a trusted medical information source, boasting licensed doctors, medical reviewers, and evidence-based health advice.

218. Under California's Confidentiality of Medical Information Act (CMIA), health-related data collected in a healthcare context is protected even if the entity does not provide direct medical treatment.

219. By embedding tracking codes that automatically transmit search terms related to medical conditions, treatments, and symptoms, Defendant is

44

disclosing users' protected health information to third parties without consent.

220. Defendant certainly should have been aware that its collection and transmission of user data violated state and federal privacy laws, as evidenced by the industry-wide regulatory scrutiny and enforcement actions brought against other companies engaging in similar practices.

221. Defendant's use of D/Cipher, tracking pixels, session replay technology, and targeted advertising frameworks mirrors conduct that the Federal Trade Commission has previously deemed unlawful under consumer protection statutes.

222. Defendant knowingly failed to disclose its data collection practices in its Terms of Service or Privacy Policy, depriving users of the opportunity to make an informed decision about their privacy, or to even present those policies to users to affirmatively review and agreed to before their data was taken without their consent.

223. The FTC's enforcement actions against *GoodRx* and *BetterHelp* for similar unauthorized health data sharing demonstrate that Defendant's conduct fell well outside accepted business practices.

224. Defendant's integration of third-party tracking software enabled unauthorized interception and monetization of user data, a practice that regulatory bodies and consumer privacy litigation have repeatedly challenged.

### Warning on Tracking Codes on Health Care Websites

225. The federal government has issued guidance warning that tracking codes like the Google Analytics Tag may violate federal privacy law when installed on healthcare websites such as Defendant's.

226. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the

"Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html last accessed December 14, 2023.

227. Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as the Google Analytics Tag, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. *For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures*.

The bulletin then further discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, *discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI*. Such disclosures can reveal incredibly sensitive information about an individual, *including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment*.

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*

First Amended Complaint - Class Action

Id. (footnotes omitted; bold italics added).

228. Plaintiff and Class members face the very same kinds of risks that the government describes concerns about in this bulletin

229. Defendant disclosed the sensitive private medical search terms that Plaintiff's and Class members entered on Defendant's Website and then immediately broadcast those search terms in real time and simultaneously with her entry to Google and these other Spyware Companies.

230. This search term information is, as described by the OCR in its bulletin, "highly sensitive."

231. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code*.

Id. (footnotes omitted; bold italics added).

232. Crucially, that paragraph in the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.*

Id. (footnotes omitted; bold italics added).

233. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising

from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and

Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule . . .

https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking last accessed December 14, 2024.

234.  Defendant's conduct with respect to its Website data sharing practices is directly contrary to clear pronouncements by the FTC and HHS.

## CLASS ACTION ALLEGATIONS

235.  Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in the United States who, during the class period, visited the Defendant's Website (the "Class").

236.  Plaintiff also brings this action on behalf of a subclass defined as all natural persons in California who, during the class period, visited the Website (the "California Subclass") (together with the Class, the "Classes").

237.  Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

238.  The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

239.  Excluded from the Classes is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of

First Amended Complaint - Class Action

Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

240.  Numerosity.  Members of the Classes are so numerous that joinder of all members is impracticable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records.

241.  Typicality.  Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website to research and review sensitive medical conditions and had his personally identifiable information and protected health information disclosed to Google and the other Spyware Companies without his express written authorization or knowledge.  Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

242.  Adequacy.  Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

243.  Commonality.  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Classes include:

a.  Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

50

First Amended Complaint - Class Action

b. Whether the Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Google and the other Spyware Companies;

c. Whether Google and the other Spyware Companies are third-party eavesdroppers;

d. Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendant's conduct, which allowed Google and the other Spyware Companies—unauthorized persons— to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f. Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Google Analytics Tag and the other Spyware Companies' other software to record and communicate patients' confidential medical communications;

g. Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, the CMIA, or any other relevant statute; and

h. Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

244. <u>Superiority</u>. Class action treatment is the superior method for the fair and efficient adjudication of this controversy. Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress

on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action. Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

245. The proposed class consists of hundreds of thousands of California individuals whose medical search queries and browsing behavior were surreptitiously tracked and shared by Defendant.

246. Defendant's failure to disclose these invasive data practices affects all users equally, making class-wide adjudication appropriate.

247. Defendant's real-time tracking mechanisms apply uniformly to all visitors, regardless of whether they are logged in or anonymous users.

248. Because these surveillance technologies operate at the session level, every affected class member suffered identical privacy violations, making common legal and factual issues predominant.

## CLAIMS FOR RELIEF

## COUNT I.

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)**

249. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

250. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511. The ECPA protects both sending and the receipt of communications.

251. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

252. The transmission of Plaintiff's private and confidential information to

First Amended Complaint - Class Action

Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

253. The transmission of the private and confidential information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

254. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

255. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

256. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

257. The following instruments constitute "devices" within the meaning of the ECPA:

   a. The computer codes and programs Google and the other Spyware Companies used to track Plaintiff and Class Members communications while they were navigating the Website;

   b. Plaintiff's and Class Members' browsers;

   c. Plaintiff's and Class Members' mobile devices;

   d. Defendant and Google's and the other Spyware Companies' web and ad servers;

   e. The plans Defendant and Google and the other Spyware Companies carried

First Amended Complaint - Class Action

out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

258. Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

259. By utilizing and embedding the Google Analytics Tag and the other software provided by the other Spyware Companies on its Website, Defendant intentionally intercepted in real time and while in transit, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

260. Specifically, Defendant intercepted in real time and while in transit Plaintiff's and Class Members' electronic communications through the Google Analytics Tag and other Spyware Companies' software implementations on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' private and confidential information to third parties, such as Google.

261. Defendant intercepted in real time and while in transit or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding private and confidential information, including their Google account and treatment information. This confidential information was then monetized for targeted advertising purposes.

262. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Google and the other Spyware Companies, their affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a),

54

1    Defendant violated 18 U.S.C. § 2511(1)(c).

2    263.  By intentionally using, or endeavoring to use, the contents of Plaintiff's and

3         Class Members' electronic communications, while knowing or having reason

4         to know that the information was obtained through the interception of an

5         electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant

6         violated 18 U.S.C. § 2511(1)(d).

7    264.  Defendant's deployment of tracking pixels and JavaScript code constitutes

8         real-time, contemporaneous interception of communications under the

9         Wiretap Act, 18 U.S.C. § 2511(1).

10   265.  Defendant's tracking technology captures user inputs and transmits them to

11        third parties in milliseconds, before the user receives a response from the

12        website server.

13   266.  Unlike passive data collection, Defendant's tracking scripts actively record

14        interactions as they occur, satisfying the definition of "interception" under

15        *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010).

16   267.  Defendant intentionally intercepted in real time and while in transit or

17        intentionally assisted in the interception of the contents of Plaintiff's and

18        Class Members' electronic communications for the purpose of committing a

19        criminal or tortious act in violation of the Constitution or laws of the United

20        States or of any state, namely, invasion of privacy, among others.

21   268.  The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that

22        intercepts or causes interception to escape liability if the communication is

23        intercepted for the purpose of committing any tortious or criminal act in

24        violation of the Constitution or laws of the United States or of any State.

25        Here, as alleged above, Defendant violated a provision of the Health

26        Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-

27        6(a)(3). This provision imposes a criminal penalty for knowingly disclosing

28        individually identifiable health information ("IIHI") to a third party. HIPAA

55

defines IIHI as:

> any information, including demographic information collected from an individual,
>
> that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-6.

269.   Plaintiff's information that Defendant assisted Google in intercepting qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase their profit margins. Defendant specifically used the Google Analytics Tag and the other software implemented by Defendant from the other Spyware Companies to track and utilize Plaintiff's and Class Members' private and confidential information for financial gain.

270.   Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

271.   Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Google Analytics Tag or the other software implemented on Defendant's Website from the Spyware Companies.

272.   Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

First Amended Complaint - Class Action

273.  The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

274.  As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II.

**Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631**

275.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

276.  The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications   " Cal. Penal Code § 630.

277.  A person violates California Penal Code § 631(a), if:

by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

278.  Further, a person violates Section 631(a) if s/he "aids, agrees with, employs,

First Amended Complaint - Class Action

or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

279. To avoid liability under Section 631(a), a defendant must show it had the consent of **all** parties to a communication.

280. The court in *Zarif v. Hwareh.com, Inc.* also examined whether tracking software could be considered a third-party interceptor under CIPA Section 631. *Zarif v. Hwareh.com, Inc.,* No. 3:23-cv-00565-BAS-DEB, 2025 WL 486317 (S.D. Cal. Feb. 12, 2025).

281. In *Zarif*, the defendant contended that the software was merely an extension of its own website operations.

282. However, the *Zarif* court found that third-party data collection services could constitute eavesdropping under CIPA, depending on how they process and use the data.

283. *Zarif* supports the argument that the data collection mechanisms in the present case functioned as third-party interceptors, violating CIPA Section 631.

284. Defendant's implementation of tracking technologies enabled the real-time interception of Plaintiff's interactions with the VerywellHealth.com website, constituting a violation of CIPA § 631.

285. The data capture occurred contemporaneously with Plaintiff's input of search terms, navigation between pages, and engagement with specific health-related content.

286. Defendant's use of third-party tracking services facilitated this interception before Plaintiff's communications were fully received by Defendant's website servers, thereby satisfying the Wiretap Act's requirement for an "interception" during transmission.

First Amended Complaint - Class Action

287. California courts have recognized that the placement of session-replay scripts, tracking pixels, and analytics software on a website constitutes a form of unauthorized surveillance if it captures user interactions without consent.

288. Defendant's tracking mechanisms functioned as a third-party eavesdropper by siphoning data to external companies, which then processed and analyzed the information for commercial exploitation.

289. The Ninth Circuit's decision in *Cody v. Ring LLC, 718 F. Supp. 3d 993 (N.D. Cal. Feb. 22, 2024)*, supports this interpretation, holding that keystroke monitoring and similar technologies like Defendant's qualify as illegal wiretaps under CIPA.

290. In *Smith v. Yeti Coolers, LLC*, the plaintiff alleged that Yeti violated California Penal Code § 631(a) by aiding and abetting its third-party payment processor, Adyen, in the unauthorized interception of customers' financial data for fraud prevention and marketing purposes. The *Smith* court dismissed the case, finding that the plaintiff failed to sufficiently allege Yeti's knowledge and intent regarding Adyen's conduct, holding that mere use of a third-party service does not establish derivative liability without specific facts demonstrating the defendant's active participation in the unlawful conduct. *Smith v. Yeti Coolers, LLC*, No. 24-cv-01703-RFL, Dkt. 42, pp. 1-4 (N.D. Cal. Mar. 14, 2025).

291. In *Valenzuela v. Kroger Co.*, the plaintiff alleged that Kroger violated California Penal Code § 631(a) by aiding and abetting third-party software provider Emplifi in unlawfully intercepting customer chat communications on Kroger's website. The court dismissed the case, holding that the plaintiff failed to plausibly allege that Kroger had knowledge of Emplifi's data collection practices or intent to assist in any unlawful conduct. The court emphasized that merely embedding a third-party service on a website does not establish liability absent specific allegations of knowing participation in

the alleged privacy violations. *Valenzuela v. Kroger Co.*, No. CV 22-6382-DMG (AGRx), Dkt. 55, pp.1-5 (C.D. Cal. Mar. 13, 2025).

292. Unlike the *Yeti* and *Kroger* cases, where the courts found insufficient allegations that defendants had knowledge of third-party tracking, Defendant Dotdash Meredith did not merely integrate an independent payment processor or chatbot but instead actively developed, marketed, and deployed D/Cipher, a proprietary first-party data tracking system that intercepts, analyzes, and monetizes user data, including sensitive medical search terms related to sexually transmitted infections and reproductive health.

293. Defendant cannot plausibly claim ignorance or passive involvement because D/Cipher is a first-party system, not an external tool like payment processing or chatbot plugins, meaning Defendant directly controls and profits from data collection.

294. Defendant publicly stated in press releases that it tracks users across its forty-plus brands to build detailed consumer profiles, targeting them with AI-enhanced advertising.

295. Unlike other data privacy lawsuits Under CIPA where the court found no plausible inference that the defendant knew of a website plugin's specific misconduct, Defendant openly promotes its use of AI-driven tracking to improve ad targeting and drive revenue.

296. Moreover, Defendant's financial disclosures reveal a sixteen-million-dollar contract with OpenAI, confirming its data monetization strategy extends beyond simple website analytics.

297. By embedding tracking scripts on VerywellHealth.com, Defendant willfully assisted and agreed with outside third-parties like Google, DoubleClick, and other Spyware advertising networks to intercept and transmit instantaneously search queries entered by users, including highly sensitive health-related terms.

First Amended Complaint - Class Action

298. The conduct at issue is not passive data collection but an intentional, systemic monetization of users' confidential health information in coordination with third parties, directly violating CIPA.

299. At all relevant times, Defendant aided, agreed with, and conspired with Google and the other Spyware Companies to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted in real time and while in transit without the authorization and consent of Plaintiff and Class Members.

300. Defendant, when aiding and assisting Google's Google and the other Spyware Companies' wiretapping and eavesdropping, intended to help those third parties learn some meaning of the content in the URLs, the specific search terms typed in by the website's visitor, and the content the visitor requested.

301. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Google Analytics Tag and the software implemented by Defendant from the other Spyware Companies falls under the broad catch-all category of "any other manner":

a. The computer codes and programs Google and the other Spyware Companies used to track Plaintiff and Class Members' communications while they were navigating the Website

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Google's and the other Spyware Companies' web and ad servers;

e. The web and ad-servers from which Google and the other Spyware Companies tracked and intercepted in real time and while in transit Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and the other Spyware Companies to effectuate its tracking and interception of Plaintiff's and

Class Members' communications while they were using a browser to visit the Website; and

g. The plans Google and the other Spyware Companies carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile device to visit the Website.

302. The information that Defendant transmitted using the Google Analytics Tag, including the appointment location, the type of procedure a patient is interested in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment constituted sensitive and confidential personally identifiable information.

303. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

304. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, California Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

305. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## **COUNT III.**

### **Violation of the California Confidentiality of Medical Information Act Cal. Civ. Code § 56.10**

First Amended Complaint - Class Action

306. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

307. Under the California Confidentiality of Medical Information Act, California Civil Code section 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization. Medical information refers to:

> any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment. "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual .
> . . .

308. Plaintiff and Class Members are patients under the definition of the CMIA because Plaintiff and Class Members received "health care services from a provider of health care" and the information Defendant shared to Google and the other Spyware Companies was "medical information pertain[ing]" to Plaintiff and Class Members. Cal. Civ. Code § 56.05(m).

309. Defendant is a "provider of health care" as defined in California Civil Code section 56.05(p) because Defendant offers various cosmetic medical services. Defendant is also considered a "provider of health care" under California Civil Code section 56.06, subdivisions (a) and (b), because Defendant's Website maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, of for the diagnoses, treatment, or management of a medical condition.

310. Therefore, as a provider of health care, Defendant is subject to the requirements of the CMIA and had an ongoing obligation to comply with the

CMIA's requirements regarding the maintenance of its user's medical information.

311. Defendant functions as a recipient and processor of confidential medical information under CMIA, Cal. Civ. Code § 56.10.

312. The data intercepted includes search queries related to specific health conditions, which qualifies as protected medical information under CMIA.

313. Defendant knowingly discloses this medical data to third parties for profit, violating California's medical privacy protections.

314. As set forth hereinabove, the unique identifiers alleged in this Complaint in Figure 1 above are identifiers sufficient to allow identification of an individual.

315. Along with patients' various unique identifiers shown in Figure 1, Defendant disclosed to Google and the other Spyware Companies several pieces of information regarding its patients' use of Defendant's Website that included, but was not limited to, patient medical conditions and treatment search terms searched for by website visitors.

316. This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition. Accordingly, it constituted medical information pursuant to the CMIA.

317. As demonstrated hereinabove, Defendant failed to obtain its patients' valid authorization for the disclosure of medical information.

318. Pursuant to CMIA section 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Accordingly, information set forth in Defendant's

First Amended Complaint - Class Action

Website Privacy Policy does not qualify as a valid authorization.

319. Based on the above, Defendant violated the CMIA by disclosing its patients' medical information to Google and the other Spyware Companies.

320. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code §56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code §56.36.

321. Pursuant to California Penal Code section 637.2, Plaintiffs and Class Members have been injured by the violations of California Penal Code section 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV.

### Invasion of Privacy Under California's Constitution

322. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

323. In *Valenzuela*, the court held that merely using a chatbot service was not sufficiently egregious to establish a privacy violation under California's Constitution. *Valenzuela v. Kroger Co.*, No. CV 22-6382-DMG (AGRx), Dkt. 55, pp.1-5 (C.D. Cal. Mar. 13, 2025).

324. However, Defendant's conduct as alleged in this case is far more invasive because Plaintiff's search queries involved private medical conditions, such as sexually transmitted infections, which carry heightened legal and social sensitivity.

First Amended Complaint - Class Action

325. FTC enforcement actions against GoodRx and BetterHelp confirm that transmitting health-related data to third parties constitutes a serious invasion of privacy, reinforcing that this conduct is widely condemned.

326. Unlike the *Kroger* retail chatbot, Defendant's health-focused website cultivates user trust and expectation of privacy, which it then exploits for commercial gain.

327. Defendant fails to provide users with any meaningful disclosure that their search terms will be intercepted and shared, exacerbating the severity of the privacy intrusion.

328. These factors make Defendant's actions a substantial departure from social norms, establishing a serious and egregious privacy violation under California law.

329. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

330. At all relevant times, by using the Google Analytics Tag to record and communicate patients' sensitive and confidential online medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

331. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

332. Plaintiff and Class Members did not authorize Defendant to record and

First Amended Complaint - Class Action

transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information to Google and the other Spyware Companies

333. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

334. Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under California's Constitution.

## <u>COUNT V.</u>

### Violation of the California Computer Data Access and Fraud Act
### Cal. Penal Code. § 502

335. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

336. The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

337. Plaintiff's and Class members' mobile computing devices and personal computers containing Defendant's Securly software constitute "computers" within the scope of the CDAFA.

338. Defendant violated the CDAFA Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B)

wrongfully control or obtain money, property, or data;"

339. Defendant violated the CDAFA Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

340. Defendant violated the CDAFA Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

341. Defendant knowingly accessed Plaintiff's and Class members' computers without their permission by including within the third-party Spyware Company software described herein, which intercepts and transmits data, communications, and personal information concerning Plaintiff and Class members.

342. Defendant used data, communications, and personal information that it intercepted in real time and while in transit and took from Plaintiff's and Class members' computers to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class members.

343. Defendant took, copied, intercepted in real time and while in transit, and made use of data, communications, and personal information from Plaintiff's and Class members' computers.

344. Defendant knowingly and without Plaintiff's and Class members' permission accessed or caused to be accessed their computers, by installing its third-party Spyware Companies' software without Plaintiff's and Class members' informed consent, a software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class members.

345. Plaintiff and Class members are residents of California and used their

68

computers in California at all relevant times in which Defendant made such unauthorized access.

346. Defendant accessed or caused to be accessed Plaintiff's and Class members' data, communications, and personal information from California.

347. Defendant uses data servers that are in part located in California and allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class members.

348. Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

349. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members suffered damages.

350. Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

351. Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class members seek an award of reasonable attorneys' fees and costs.

352. Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

## COUNT VI.

### Use of a Pen Register or Trap and Trace Device

### Cal. Penal Code § 638.51

353. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

354. California Penal Code Section 638.50(b) defines a "pen register" as "a device

First Amended Complaint - Class Action

or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

355. California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

356. In *Greenley v. Kochava, Inc.*, the court addressed whether data tracking software could be considered a "pen register" under the California Invasion of Privacy Act (CIPA). *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023).

357. The *Greenley* court found that the defendant's software, which collected various forms of user data, could plausibly constitute a pen register.

358. Specifically, the *Greenley* court noted that the software's ability to "fingerprint" devices and gather data such as search terms and location information aligned with the statutory definition of a pen register under CIPA.

359. *Greenley* supports the classification of the data collection mechanisms in the present case as "pen registers."

360. Defendant's third-party software from Google and other Spyware Companies installed on Plaintiffs' and other Class Members' devices by its Website constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class members' location data and other sensitive personal information—from the electronic communications transmitted by their computers.

361. Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class members' location data and personal information.

362. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined

at trial.

## COUNT VII.

## Violation of the Computer Fraud and Abuse Act

## 18 U.S.C. § 1030

363.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

364.   Plaintiff alleges that Defendant violated the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing Plaintiffs' and Class Members' devices without authorization, or by exceeding authorized access, to obtain information from protected computers used in interstate or foreign commerce.

365.   Plaintiff's device qualifies as "protected computers" under the CFAA, as they are connected to the internet and used in interstate communications.

366.   The court in *Greenley v. Kochava, Inc.* also addressed the issue of user consent under the California Computer Data Access and Fraud Act (CDAFA). *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024 (S.D. Cal. 2023).

367.   The *Kochava* defendant argued that user agreements with third parties, such as app developers, constituted consent for data collection.

368.   However, the court rejected this argument, emphasizing that consent must be explicit and cannot be inferred from generalized agreements with third parties.

369.   *Greenley* reinforces the principle that website visitors do not implicitly consent to data interception merely by using the site, supporting the assertion that the data collection in this case occurred without proper user consent.

370.   Plaintiff further alleges that Defendant intentionally accessed Plaintiff's and Class Members' protected computers to obtain private and sensitive information, including but not limited to geolocation data, search histories, keystrokes, communications, and page viewing activities, without

authorization or consent, in violation of 18 U.S.C. § 1030(a)(2).

371.  Defendant intentionally exceeds authorized access by injecting tracking technologies that extract data beyond what is necessary for website functionality.

372.  Plaintiff's browsing activity was harvested and monetized without permission, constituting a CFAA violation under 18 U.S.C. § 1030(a)(2)(C).

373.  The damage threshold of $5,000 is satisfied because Defendant's practices result in cumulative consumer losses exceeding this statutory minimum, including privacy violations and monetization of sensitive search histories.

374.  As a direct and proximate result of Defendant's unauthorized access, Plaintiff and Class Members suffered loss and damage, including the invasion of their privacy and the unauthorized use of their personal information. Plaintiffs allege that Defendant's violations of the CFAA entitle them to recover compensatory damages and injunctive relief under 18 U.S.C. § 1030(g).

375.  The statute provides that any person suffering damage or loss due to a violation may maintain a civil action to obtain compensatory damages, injunctive relief, or other equitable relief.

376.  Plaintiff alleges that Defendant's actions caused "loss" as defined by 18 U.S.C. § 1030(e)(11), which includes the impairment of the integrity and availability of data, programs, and systems on Plaintiff and Class Members' protected computers.

377.  As a result of Defendant's conduct, Plaintiff and Class Members are entitled to recover damages in an amount to be proven at trial, including statutory damages for any damage or loss caused by Defendant's unauthorized access.

## COUNT VIII.

### Violation of the Stored Communications Act

### 18 U.S.C. § 2701

378.  Plaintiff repeats, re-alleges, and incorporates by reference, all other

paragraphs.

379. Plaintiff also alleges that Defendant violated the Stored Communications Act (SCA), 18 U.S.C. § 2701(a), by intentionally accessing Plaintiffs' and Class Members' electronic communications stored on their devices without authorization.

380. Defendant accessed and obtained stored electronic communications, including search history, messages, and other data, without proper consent.

381. Plaintiff further alleges that Defendant exceeded any authorized access by using its spyware software from Google and the other Spyware Companies to access and disclose Plaintiff's and Class Members' stored electronic communications for commercial gain, in violation of 18 U.S.C. § 2701(a)(1) and (a)(2).

382. Defendant unlawfully accesses and discloses Plaintiff's stored web activity to third parties without proper authorization.

383. The Google Analytics and DoubleClick scripts embedded in Defendant's website store session data linked to individual users.

384. Defendant sells and transmits this stored session data to third-party advertisers without user consent, violating 18 U.S.C. § 2701.

385. Defendant knowingly accessed and stored Plaintiff's electronic communications without authorization by embedding tracking scripts and cookies that preserved search history, browsing activity, and referral data.

386. This information was retained and subsequently shared with third parties in a retrievable format, meeting the definition of "electronic storage" under the Stored Communications Act.

387. Defendant's actions parallel those in *In re Google Assistant Priv. Litig., 457 F. Supp. 3d 797 (N.D. Cal. 2020)*, where the court found that stored user queries within an online platform constituted protected electronic communications under the SCA.

388. Because Defendant stored and later accessed user-generated queries and navigation history, its conduct violated Plaintiff's statutory rights under the SCA. Plaintiff did not consent to this retention or subsequent disclosure, and Defendant's actions were not necessary for the ordinary transmission of communications within its website.

389. As a result of Defendant's violations of the Stored Communications Act, Plaintiff and Class Members are entitled to statutory damages of no less than $1,000 per violation under 18 U.S.C. § 2707(c).

390. Additionally, Plaintiff and Class Members are entitled to recover punitive damages under the SCA if it is established that Defendant acted with willful or intentional disregard for the privacy rights of Plaintiff and Class Members.

391. Plaintiff seeks compensatory damages, statutory damages, punitive damages (as applicable), and injunctive relief for Defendant's violations of both the CFAA and the SCA, along with reasonable attorneys' fees and costs as provided under 18 U.S.C. §§ 1030(g) and 2707(b), respectively.

## COUNT IX.

### Violation of the Federal Wiretap Act

### 18 U.S.C. § 2511

392. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

393. Plaintiff alleges that Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2511, by intentionally intercepting the electronic communications of Plaintiff and Class Members while they were using school-issued devices.

394. These communications included private messages, search histories, and other digital communications that were intercepted in real time and while in transit and transmitted to unauthorized third-party Spyware Companies in real-time.

395. Plaintiff further alleges that Defendant's interception of these communications occurred without the consent of the Plaintiff or Class

Members, as required under 18 U.S.C. § 2511(1)(a).

396.   Defendant's actions were taken without proper legal authorization or consent, constituting a violation of the Federal Wiretap Act.

397.   The communications intercepted in real time and while in transit by Defendant included highly sensitive personal information, including but not limited to, search queries, messages, and browsing activity conducted on their devices.

398.   Defendant's actions in intercepting these communications were done for the purpose of using the data for commercial gain, including targeting Plaintiff and Class Members for marketing or other purposes.

399.   In *Zarif v. Hwareh.com, Inc.*, the court analyzed the Wiretap Act's requirement for contemporaneous interception of electronic communications. *Zarif v. Hwareh.com, Inc.*, No. 3:23-cv-00565-BAS-DEB, 2025 WL 486317 (S.D. Cal. Feb. 12, 2025).

400.   The *Zarif* court held that the defendant's use of tracking software to capture user interactions in real-time constituted an interception during transmission.

401.   This interpretation aligns with the present case involving this Defendant, where its data collection mechanisms captured user interactions contemporaneously, satisfying the interception requirement under the Wiretap Act.

402.   In *Valenzuela v. Kroger Co.*, the court emphasized that data must be intercepted contemporaneously to qualify as a Wiretap Act violation.

403.   Unlike *Valenzuela*, Defendant's tracking mechanisms in fact capture user search queries, page navigation history, and metadata in real-time, transmitting them before the user fully interacts with the website.

404.   Defendant's tracking is functionally equivalent to session replay spyware, a type of real-time interception that courts have repeatedly held violates wiretap laws.

First Amended Complaint - Class Action

405.  The *FTC v. BetterHelp* (2023) and *In re Google Assistant Privacy Litig.* (2020) actions confirm that tracking medical searches and transmitting them to advertising platforms constitutes an illegal interception of electronic communications.

406.  Unlike passive data logging, Defendant's D/Cipher and Google Analytics extract search queries milliseconds after they are entered, satisfying the real-time interception requirement established in *United States v. Szymuszkiewicz*, 622 F.3d 701 (7th Cir. 2010).

407.  By intercepting users' medical inquiries in real-time and without consent, Defendant's conduct squarely falls within Wiretap Act and Stored Communications Act violations.

408.  As a result of Defendant's violations of the Federal Wiretap Act, Plaintiff and Class Members are entitled to statutory damages of $100 per day for each day of violation or $10,000 per violation, whichever is greater, as provided by 18 U.S.C. § 2520(c)(2).

409.  Plaintiff and Class members are further entitled to punitive damages under 18 U.S.C. § 2520(b)(2) due to the willful and intentional nature of Defendant's conduct in intercepting Plaintiffs' and Class Members' communications without authorization.

410.  Additionally, Plaintiffs seek injunctive relief to prevent further violations, along with the recovery of reasonable attorneys' fees and costs as provided under 18 U.S.C. § 2520(b)(3).

411.  Plaintiff seeks compensatory damages, statutory damages, punitive damages (where applicable), and injunctive relief for Defendant's violations of the Federal Wiretap Act, along with reasonable attorneys' fees and costs as provided by the statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated,

76

seeks judgment against Defendant, as follows:

    a) For a determination that this action is a proper class action;

    b) For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

    c) For an order declaring that Defendant's conduct violates the statutes referenced herein;

    d) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

    e) An award of statutory damages to the extent available;

    f) For punitive damages, as warranted, in an amount to be determined at trial;

    g) For prejudgment interest on all amounts awarded;

    h) For injunctive relief as pleaded or as the Court may deem proper; and

    i) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs and Class Members are entitled to, and demand, a trial by jury.

Respectfully submitted,

**Swigart Law Group**

Date: March 26, 2025    By: *s/ Joshua Swigart*
Joshua B. Swigart, Esq.
Josh@SwigartLawGroup.com
Attorneys for Plaintiffs
and the Putative Class